## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TROY'S TOWING, INC., a Michigan corporation,
H&B LAND, INC., a Michigan corporation, WAYNE'S
SERVICE, INC., a Michigan corporation, 7 D'S TOWING
AND STORAGE, INC., a Michigan corporation, ABA
IMPOUND, INC., a Michigan corporation, and
BOBBY'S TCB TOWING SERVICE, INC. a Michigan
corporation,

                                                Case No. 23-cv-13182

      Plaintiffs,                      Hon.

vs.

CITY OF DETROIT, a Michigan Municipal
Corporation,

      Defendant.

_____/

JAMES R. AUSTIN (P-43400)
MICHAEL J. CORCORAN (P41254)
Corcoran Austin, P.C.
Attorneys for Plaintiffs
6880 Thayer Lake Dr.
Alden, MI 49612
248-909-4752
jaustin@jaustinlaw.com

_____/

**There is no other cause of action between the same or similar parties arising out the same transaction or occurrence.**

## COMPLAINT AND JURY DEMAND

      NOW COME Plaintiffs, TROY'S TOWING, INC., a Michigan corporation,

H&B LAND, INC., a Michigan corporation, WAYNE'S SERVICE, INC., a Michigan

corporation, 7 D'S TOWING AND STORAGE, INC., a Michigan corporation, ABA IMPOUND, INC., a Michigan corporation, and BOBBY'S TCB TOWING SERVICE, INC., a Michigan corporation (Collectively, "Towing Company Plaintiffs"), by and through their attorneys, Corcoran Austin, P.C., and hereby complain against Defendant, City of Detroit as follows:

**NATURE OF TOWING COMPANY PLAINTIFFS' CLAIMS**

1.      Towing Company Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1343, and 1367; and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*. Plaintiff's related state law claims are brought pursuant to MCL 123.1404, MCL 257.252g, breach of contract, unjust enrichment, common law and statutory conversion and fraud.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over Towing Company Plaintiffs' claims pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

3.      This Court has jurisdiction to render and issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

4.      Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because Towing Company Plaintiffs conduct business in the Eastern District of Michigan, and the actions giving rise to this Complaint occurred within the Eastern District of Michigan.

5.      Jurisdiction is otherwise proper in this Court as damages exceed $75,000.

## **PARTIES**

6.      Plaintiff, Troy's Towing, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 9615 Grinnell, Detroit, Michigan.

7.      Plaintiff, H&B Land, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 13000 East McNichols, Detroit, Michigan.

8.      Plaintiff, Wayne's Service, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 20495 Sherwood, Detroit, Michigan.

9.      Plaintiff, 7 D's Towing and Storage, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 5700 Nevada, Detroit, Michigan.

10.     Plaintiff, ABA Impound, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 14201 Joy Road, Detroit, Michigan.

11. Plaintiff, Bobby's TCB Towing Service, Inc. is a Michigan corporation, in good standing, with its principal place of business located at 10401 Lyndon, Detroit, Michigan.

12. Defendant, City of Detroit is a Michigan municipal corporation with its principal offices located at 2 Woodward Avenue, Detroit, Michigan, 48226.

13. The City of Detroit Police Department ("DPD") is a department of Defendant City of Detroit.

## FACTS

### The City of Detroit did not operate a motor vehicle storage facility or towing operation before September 30, 2018

14. MCL123.1402(a) of the Michigan Motor Vehicle Storage Facilities Act states:

> Except as otherwise provided in section 3 or 3a, beginning on the effective date of this act, a local government or law enforcement agency shall not do any of the following:
>
> > (a) Operate a motor vehicle storage facility or towing operation.

15. MCL 123.1403(1) states:

> If, on or before the effective date of this act, a local government or law enforcement agency is operating a motor vehicle storage facility or towing operation, that local government or law enforcement agency may continue to operate that motor vehicle storage facility or towing operation after the effective date of this act.

Case 2:23-cv-13182-LJM-DRG   ECF No. 1, PageID.5   Filed 12/13/23   Page 5 of 81

16. The effective date of the amendments to the Motor Vehicle Storage Facilities Act, MCL 123.1401-1404 was September 30, 2018.

17. A municipality that did not operate a towing operation and/or motor vehicle storage facility on or before September 30, 2018 was barred from establishing a towing operation or motor vehicle storage facility.

18. On September 20, 2018, Detroit Mayor Michael Duggan and DPD Chief James Craig issued a "Joint Directive" authorizing, subject to the approval of the Detroit Board of Police Commissioners ("BOPC"), the DPD to operate its own motor vehicle storage facilities and towing operations, the Police Towing and Impound Unit ("PTIU"). See **Exhibit 1**.

19. On September 20, 2018, then Assistant Chief of the DPD, James White, made a presentation to the BOPC regarding the establishment of a towing operation and vehicle storage operation to be run by the DPD, which was summarized in the Draft Minutes of the BOPC as follows (emphasis added):

> **Detroit Police Towing, Assistant Chief James White**. Assistant Chief James White indicated that the Police Department has evaluated the feasibility of creating a Detroit Police Department civilian towing operations embedded within the Department. White indicated that the ***projected date for the operation was September 30, 2018***. ***White indicated the Department has purchased six tow trucks and has hired drivers who will be trained within the next week to operate the tow truck***. White indicated that in cases wherein the DPD towing operation is insufficient to meet the demand for towing on any given day, the Department would revert to the current tow rotation as backup for

tow operations. White indicated that the Department would handle the day-to-day towing operations including the supervision of the operations and that the Board of Police Commissioners would retain oversite for the program. The operations would not accept cash and would operate from 7:00 AM to 10:00PM seven days a week. White indicated that the previous Request for Proposal for Towing and Storage Facilities issues by City of Detroit Purchasing was placed on hold. White indicated that management data for the program would be housed in the Records Management System (RMS) and data and reports will be available via the RMS system. White also indicated that quarterly reports on the operation of the program will be provided to the Police Board. White also indicated that the fee structure for the program would remain the same as authorized by the City of Detroit Rate Commission (including Administrative Fees, payable to the City). ***White indicated that payment of the program will come from fees collected and would not result in added appropriations to the Police budget. White acknowledged that the Board had transmitted 15 questions and that the Department would respond to these questions in writing within 30 days***. AC White also indicated that the Department would like to re-direct hardship request to be presented to the Board of Police Commissioners. Commissioner Lisa Carter requested an update tow rotation list. Commissioner Jim Holley asked about the impact to existing towing companies. Holley also requested a copy of the DPD organizational chart which would show the reporting and command line associated with the program. Commissioner Conrad Mallett, Jr., indicated that the Board establish clear guideline for hardship cases. Commissioner Eva Dewaelsche asked if the new civilian tow operations represented best practices and did in consideration of the technology associated with the program represent the best technology available for the program. AC White responded that the Department current RMS system contains a module that is within leading technology standards. Dewaelsche also discussed the need to hire Detroiters in the program. AC White indicated that 10 of the 12 individuals hired in the program are Detroiters and updated the number of trucks that will be available is nine trucks. Commissioner Brown inquired if the complaints from the tow operations will go to OCI and if online payments are possible. (See **Exhibit 2**)

20.     Despite the enormous change in towing policy that Assistant Chief White was proposing, he specifically told the BOPC that "No formal report was prepared", so that the BOPC had no information regarding the proposed PTIU than the narrative that was being given. See **Exhibit 3** - Transcript of September 20, 2018 BOPC meeting, p.58.

21.     When Commissioner Davis questioned why Assistant Chief White felt that a hard informational package related to the proposed towing operation was not needed, AC White responded that the request he received was to report at this presentation and provide a hard copy to the BOPC within 30 days. See **Exhibit 3** Transcript p. 60**.**

22.     As set forth in this dialogue between Commissioner Holley and Commissioner Bell, the proposal and the resolution to be voted on were specifically set up so that there could be no comments from the public until after the resolution had been voted on:

COMMISSIONER HOLLEY: Just a point of procedure.

COMMISSIONER BELL: Yes, sir.

COMMISSIONER HOLLEY: You said, so we have questions here about this.

COMMISSIONER BELL: Yes.

COMMISSIONER HOLLEY: Then we have to go through preliminary-

COMMISSIONER BELL: A resolution's forthcoming.

COMMISSIONER HOLLEY: So there's no -- there's no - nothing from the audience with regards to this proposal?

COMMISSIONER BELL: The only audience participation --

COMMISSIONER HOLLEY: I'm not trying to ask for ·nothing.

COMMISSIONER BELL: No.· It would be in the two ·minutes that they have to appear before the Board.

COMMISSIONER HOLLEY: But by that time we've already gone on with the resolution.

COMMISSIONER BELL: That is correct.
(See **Exhibit 3** - Transcript pp 60-61)

23.    As the Joint Directive was not signed until September 20, 2018, notice of its inclusion on the BOPC agenda as a resolution to be voted upon for the same day could not have been made to the public until, at best, hours before the scheduled 3pm BOPC meeting.

24.    As the Joint Directive as a resolution to be voted on was not included as an item on the original BOPC meeting agenda, interested members of the public, including, but not limited to, the Towing Company Plaintiffs, were not given sufficient notice to attend and voice their objections to the Joint Directive.

25.    Neither the Joint Directive nor any description of the proposed PTIU resolution was made available to the public with sufficient notice for interested persons to be heard.

26.     The presentation of the program was made after the first public comment section of the meeting.

27.     The vote on the resolution was made before the last public comment section of the meeting.

28.     The public, including, but not limited to, the Towing Company Plaintiffs, had no opportunity to ask questions, make comments or make counter arguments regarding the proposed program before the vote was taken.

29.     At the September 20, 2018 BOPC meeting, Lieutenant Michael Parish addressed the BOPC regarding the proposed PTIU and stated, among other thing:

   a.  With respect to the equipment, the city has purchased six tow trucks. These tow trucks along with the tow trucks that the Detroit Police Department already owns *will be operational before September 30th. In fact, training will begin next week.*

   b.  As indicated before, DPD will be tasked will providing day-to-day supervisory control over this tow program, but the *BOPC shall have oversight.*

   c.  These tow trucks will be staffed by civilian VO1s (Vehicle Operators). They all hold commercial driver's licenses with air breaking (sic) endorsements. That makes the operation of these trucks in line with policy. *The training that the department will hold for these 15 VO1s will begin on Monday.*

   d.  The department *plans on using* it's current RMS system to track all vehicles and all tows.
       (See **Exhibit 3** - Transcript pp 51-53)

30.     Of note, all of Lt. Parrish's comments discuss an operation that had not

yet been put into operation:

      a.  While Lt. Parrish states that the tow trucks will be operational before September 30, they were apparently not operational on September 20.

      b.  Lt. Parrish stated that the BOPC would have oversight of the towing operation, yet BOPC was just learning about the program on September 20, 2018 and had not yet voted to approve it.

      c.  Lt. Parrish stated that training for the civilian vehicle operators would begin Monday, which was September 24, 2018, a mere six days before the amendment to MCL 123.1403 and 1404 would take effect.

      d.  Lt. Parrish stated not that the department was using its current RMS (record management system), but that it planned to use it, meaning that it was not yet operational.

31.     In 2022, the DPD put out a Request for Proposals for towing services to

be provided to DPD by private towers. See **Exhibit 4**.

32.     Any private towing operation that had applied under the 2022 RFP for

DPD towing would not have been accepted had it 1) not yet had its trucks operational;

2) did not yet have its oversight management in place; 3) had not yet started training

its tow truck operators and would not do so until 6 days before the RFP was to be

awarded; and 4) did not have its vehicle tracking system in place.

33.     At the September 20, 2018 BOPC meeting, Commissioner Holley, a

member of the board that was to have oversight of the operation that purportedly was

to be in place within 10 days, asked:

COMMISSIONER HOLLEY: Got you.· And then finally, and I appreciate your patience with me, how do we fit in? You came up -- in the beginning you talked about it, but you sort of meshed it with something else. How do the police commissioners in terms of our responsibility or accountability, in terms of how we respond to the community, how do we -- just take a moment out.· How do we fit in? (See **Exhibit 3** - Transcript p 66)

34.    AC White responded to Commissioner Holley as follows:

I think that -- currently the Board has oversight, but I think the oversight of the process will probably be much more engaged. (See **Exhibit 3** - Transcript p 66)

35.    Indeed, a member of the BOPC, charged with oversight of the towing program that was to be operational within 10 days had no idea what the BOPC's role with the program was or what he was to do, yet his role was to be more engaged in the DPD towing program than he was with the private towing permits that he as a BOPC member currently oversaw.

36.    Commissioner Holley additionally requested that the BOPC be given an organizational chart before the program was implemented, asking:

…is it possible, or will it be necessary that they will give us a organizational chart as to how this is going to work in terms of who's responsible for what? If we can have an organizational chart that basically we will view before it's implemented? Is that something you'd be able to implement? (See **Exhibit 3** - Transcript p 68)

37.    Commissioner Holley was told by Commissioner Bell, "We can't do it at this time". See **Exhibit 3** - Transcript p 68.

38.     Thus, at the time of the presentation and vote on the resolution, the DPD was unable to provide the BOPC, who was to have oversight of the program, with an organizational chart so they could know how the organization was set up and who played what role.

39.     Finally at the September 20, 2018 BOPC meeting, Commissioner Burton questioned whether the vote on the resolution was premature, stating:

> You know, I think that, you know, this is premature for us to vote on this today knowing the fact that we received an email yesterday evening about this was going to be on the agenda. I think that we as an oversight board and body, we should take on our own due diligence to look at best practices and procedures as well since the department has already looked into it on their end. I think that -- you know, I think there's -- I think we should set this aside for at least 30 days so we can go back and we can review and see what the cost and the savings is going to be for the city of Detroit and this is a good move to go along with. · ·I think that we have not been properly prepared on taking on towing issues. I know very little about towing. I understand that this is a big -- it's been a big ongoing problem. And I think that we should -- from an oversight standpoint, we should do our own due diligence to investigate this further to see if this would be the right move. (See **Exhibit 3** - Transcript pp 73-4)

40.     Despite Commissioner Burton's urging of the BOPC not to rush into the vote and to do their due diligence to make sure that they actually knew what was being voted upon, Commissioner Bell called for a vote without entertaining further discussion.

41.     At the September 20, 2018 BOPC meeting, the resolution was moved and approved authorizing the DPD to take steps to operate a motor vehicle storage facilities and towing operations (BOPC Index #09-20-2018). See **Exhibits 3** and **5**)

42.     Based upon the presentation by Assistant Chief White and Lt. Parrish and the questions of the BOPC, the DPD towing program certainly was not operational on September 20, 2018, had little chance of being fully operational on September 30, 2018, and would never have been able to respond appropriately to all of the requirements and qualifications set forth in the 2022 RFP, as the DPD would require of all the Towing Company Plaintiffs.

43.     During the September 27, 2018 meeting of the BOPC, Commissioner Willie Burton questioned whether the inclusion of the vote on the towing resolution during the September 20, 2018 meeting violated the Open Meetings Act, as the matter was added to the agenda less than 24 hours before the meeting, which failed to give members of the public the opportunity to be heard on the issue. See **Exhibit 6.**

44.     The Court in *Haven v City of Troy*, 39 Mich App 219, 224 (1972) stated (emphasis added):

> A public body might hold a hearing coincidentally with one of its meetings, but a meeting is not necessarily a hearing. The right to a hearing imports an opportunity to be heard. ***Implicit in that right is the companion right to reasonable notice not only of the time and place of a meeting of the public body required to conduct the hearing but also notice that at a particular meeting of that body***

*a particular question will be considered and those interested in that question will be given an opportunity to be heard*.

45.    By failing to include the Joint Directive as an item with a resolution to be voted upon in an agenda giving Towing Company Plaintiffs or any other member of the public sufficient time to attend the BOPC meeting and voice their opposition, pursuant to *Haven*, Defendants failed to provide Towing Company Plaintiffs with an opportunity to be heard.

46.    Mayor Duggan, Police Chief Craig and the BOPC were trying to rush a vote on the resolution approving the Joint Directive in order to, at least on paper, make it appear that the City of Detroit, on or before the September 30, 2018 effective date of the amendments to the Motor Vehicle Storage Facilities Act, was attempting to make it appear that it was operating a motor vehicle storage facility or towing operation and thus grandfathered into not being in violation of the Act.

47.    The Joint Directive was rushed to the BOPC only 10 days before the effective date of the Act, as Assistant Chief White stated that:

a.  The *projected date* for the operation was September 30, 2018;

b.  Drivers had been *hired but not yet trained*;

c.  Management data for the program *would* be housed in the Records Management System; and

d. The BOPC had transmitted 15 questions that the DPD would not respond to in writing until *30 days after the September 20, 2018 meeting, or well after the September 30, 2018 date that the amendments to the Motor Vehicle Storage Facilities Act would be in effect.* (See **Exhibit 3**)

48. Pursuant to the specific statements of Assistant Chief White, the PTIU was not operational on September 20, 2018, drivers had not been trained, management data was not yet housed and the BOPC had outstanding questions regarding the "operation" that would not be answered until 20 days after the effective date of the Motor Vehicle Storage Facilities Act amendments that would otherwise ban the City of Detroit from running a towing or vehicle storage operation.

49. Clearly, on or before September 30, 2018, the City of Detroit was not operating a motor vehicle storage facility or towing operation, but only had, at best, plans and a resolution to do so.

### 2020 Request for Proposals

50. From approximately December 2010 to September 2021, Towing Company Plaintiffs provided police towing for the DPD under tow permits awarded by Defendant. See **Exhibit 7**.

51. In September of 2021, DPD abolished the permit system for towing.

52.     From approximately September 2021 to December 21, 2022, Towing Company Plaintiffs provided police towing for the DPD without any formal contract or permit.

53.     On or about February of 2022, the DPD issued a Request for Proposals ("RFP") from qualified firms to provide police authorized towing services for the DPD. See **Exhibit 4**.

54.     The RFP set out a long list of requirements, licenses, permits and policies that had to be met just to be considered as a tower for the DPD. See **Exhibit 4**.

55.     The RFP further set out guidelines and parameters that both the chosen towers and DPD would have to abide by. See **Exhibit 4**.

56.     Each of the Towing Company Plaintiffs submitted a proposal in response to the RFP. An example submission is attached as **Exhibit 8.**

57.     Because each of the Towing Company Plaintiffs met or exceeded the requirements set forth in the RFP, they were chosen by the City of Detroit to provide police authorized towing and storage for the Detroit Police Department.

58.     On or about December 22, 2022, Defendant approved contracts (the "Contracts") with Towing Company Plaintiffs to provide police towing for the DPD. See **Exhibit 9**.

59.     The Contracts reiterated, reinforced and more specifically delineated the guidelines and parameters that were set out in the RFP that both the chosen towers and DPD would have to abide by. See **Exhibit 10**.

60.     While each of the Towing Company Plaintiffs was sent an electronic copy of the Contract, some if not all of the Towing Company Plaintiffs were not asked to sign it and return it, either electronically or hard copy.

61.     Some, if not all of the Towing Company Plaintiffs did not sign a copy of the Contract, either electronically or by hard copy.

62.     Despite the fact that at least some of the Towing Company Plaintiffs did not sign the Contract, the DPD provided each Plaintiff with a copy of the Contract electronically signed by them.

**The City of Detroit and DPD do not hold the PTIU to the same standards, regulations and requirements as it does the Towing Company Plaintiffs**

63.     The 2022 RFP for DPD Towing Services (See **Exhibit 4**) required applicant towers, including Towing Company Plaintiffs, to provide the following:

　　　　a.　Minimum 5 years of experience providing law enforcement towing services. (p.2)

　　　　b.　Three similar towing projects (law enforcement towing) with description of services provided and length of service. (p. 3)

　　　　c.　The firm's financial solvency, fiscal responsibility and financial capability. (p. 6)

d. Evidence of licenses or registrations required to provide towing services. (p. 7)

e. Background clearances for all owners, directors, managers and employees. (Attachment 1, p. 1)

f. That they will agree to operate in accordance with the highest industry standards and practices. (Attachment 1, p. 6)

g. To conduct themselves in a professional manner at all times and may not cause the public unreasonable delay. (Attachment 1, p. 6)

h. Verification that they will have sufficient facilities, equipment and personnel to perform any towing and recovery service requested by DPD. (Attachment 1, p. 7)

i. Verification that they have adequate space, equipment and personnel to handle towing requests. (Attachment 1, p. 7)

j. Verification that they provide convenient, well-managed and courteously operated storage facility for vehicles ordered impounded by DPD. (Attachment 1, p. 7)

k. Verification that they maintain an office at each storage facility with sufficient space for all necessary business capabilities. (Attachment 1, p. 7)

l. Verification that they maintain computers with software capabilities to collect vehicle information and other data, telephones, fax machines for servicing the customers and DPD. (Attachment 1, p. 7)

m. Verification that they maintain a toilet facility for use by customers. (Attachment 1, p. 8)

n. Verification that their facilities are secure for the safety and security of all towed vehicles. (Attachment 1, p. 8)

o. Verification that they have digital video recording system of the customer service area that includes audio. (Attachment 1, p. 8)

      p.  Verification that their yard/storage facility includes a digital video recording system. (Attachment 1, p.8)

      q.  Verification that they must accept cash and at least three major credit cards. (Attachment 1, p. 9)

64.    While it is Towing Company Plaintiffs' position that the PTIU is unlawful, DPD has run the PTIU as a towing operation and storage facility since sometime after September 30, 2018.

65.    While the RFP required the applying towing companies, including Towing Company Plaintiffs, to provide and abide by the items set forth in Paragraph 63 above, the unlawful PTIU was not in 2018, was not at the time of the issuance of the 2022 RFP and is not currently required to do the same, to wit:

      a.  The PTIU did not in 2018, at the time of the issuance of the 2022 RFP or currently have 5 years of experience providing law enforcement towing services.

      b.  The PTIU have never provided similar towing projects to any entity, law enforcement or otherwise.

      c.  In 2018 the PTIU had no financial solvency, fiscal responsibility and financial capability. They currently are showing no financial solvency, fiscal responsibility or financial capability, as they have taken money from GSD and other Detroit City funds other than towing revenue to 1) purchase property; 2) improve property; and 3) purchase trucks and equipment.

      d.  All private towers must have USDOT and CVED authorization and maintain standards to keep that authorization. DPD towing vehicles have neither USDOT nor CVED authorization and most if not all DPD towing vehicles could not pass a USDOT or CVED inspection.

e.  PTIU towers provide no background clearances for all owners, directors, managers and employees.

f.  PTIU towers and towing facilities do not operate in accordance with the highest industry standards and practices and would fail any audit that is required of Towing Company Plaintiffs.

g.  PTIU towers and towing facilities do not conduct themselves in a professional manner at all times and may cause the public unreasonable delay. Specifically, DPD vehicles have broken equipment, storage facilities are overloaded to the extent that they require Towing Company Plaintiffs to stack vehicles brought to DPD facilities on top of existing vehicles or take the vehicles to a storage yard 20 minutes away from the tower's home precinct. See **Exhibit 11a** – photographs of vehicles; and **11b** – photographs of lots.

h.  The PTIU does not have sufficient facilities, equipment and personnel to perform any towing and recovery service requested by DPD.

i.  The PTIU does not have adequate space, equipment and personnel to handle towing requests.

j.  The PTIU does not provide convenient, well-managed and courteously operated storage facility for vehicles ordered impounded by DPD. In fact, DPD storage facilities are dangerous not only to vehicle owners, but to Towing Company Plaintiffs entering onto the property, as the areas upon which they must drive are covered with glass, screws, nails, vehicle parts and debris, causing damage to Towing Company Plaintiffs' vehicles. See **Exhibit 11c**

k.  The PTIU does not maintain an office at each storage facility with sufficient space for all necessary business capabilities. In fact, some DPD storage facilities have either no office or have a trailer as an office, something that Towing Company Plaintiffs are forbidden to have. See **Exhibit 11d**

l.  The PTIU does not maintain computers with software capabilities to collect vehicle information and other data, telephones, fax machines

for servicing the customers and DPD. In fact, most DPD storage
facilities do not have telephone service on site.

m.  Most PTIU towing and storage facilities fail to maintain a toilet
facility for use by customers. If there is a toilet facility, it is a portable
unit, and no facility has an ADA compliant toilet facility, which is
required for Towing Company Plaintiffs. See **Exhibit 11d.**

n.  The PTIU does not keep their facilities secure for the safety and
security of all towed vehicles. Just as Towing Company Plaintiffs'
vehicles are damaged by the conditions of the DPD facilities, so are
the vehicles that are towed in either by Towing Company Plaintiffs or
DPD towers. See **Exhibit 11c**

o.  Vehicle owners coming to PTIU lots to retrieve or redeem their
vehicles are required to park on city streets, and in some cases, in
bicycle lanes, instead of inside of the PTIU lot, while Towing
Company Plaintiffs are required to have parking spaces for customers
within their storage lots. See **Exhibit 11e**

p.  Vehicle owners coming to PTIU lots to retrieve or redeem their
vehicles are required to wait outside of the PTIU lot rather than being
allowed into the PTIU office. See **Exhibit 11f**

q.  The PTIU does not have digital video recording system of the
customer service area that includes audio.

r.  Most, if not all DPD yard/storage facility do not have a digital video
recording system and there are no cameras throughout the yard to
provide security.

s.  DPD towers will not accept cash.

66.     Further, the Contracts state in the Scope of Services at Section II

(B)(2)(e):

    e.  Capacity

        All police authorized towers must have sufficient facilities,
equipment, and personnel to perform any towing and recovery
service requested by the DPD. All tow companies must have the
capacity to respond to the scene where services are being requested
with the appropriate equipment within 20 minutes of the time of the
dispatch. (See **Exhibit 10**)

67.     The Contracts state in the Scope of Services at Section II (B)(2)(f):

    a.  Facilities

        Police Authorized Towers must provide convenient, well-managed,
and courteously operated storage facilities for vehicles ordered
impounded by the DPD. Tow companies shall maintain an office at
each storage facility with sufficient space for all necessary business
capabilities. Tow companies must maintain computers with software
capabilities to collect vehicle information and other data, telephones,
fax machines for servicing the customer and the Department. All
customer service phone lines shall be recorded. The recordings shall
be retained for no less than 30 days.

        Tow companies must maintain a toilet facility for use by customers.
Police Authorized Towers shall be responsible for securing the
facilities and for the safety and security of all towed vehicles. Tow
companies shall install and maintain a digital video recording system
of the customer service area that includes audio. Each yard / storage
facility shall include a digital video recording system but will not
require audio. All video and recordings shall be retained for not less
than 45 days.

        Police authorized towers may own or lease their storage facilities,
provided the land and structures that make up the facilities comply
with all local, state, and federal requirements. All police authorized

towers shall operate and maintain their facilities in accordance with all applicable zoning requirements, local, state, and federal law.

The City shall have the right to enter the tow company's facilities at any time for purposes of inspecting the premises, vehicles on site, audio / video recordings, and any records pertaining to any vehicles being stored at the location.

To facilitate audits and inspections by DPD personnel, all vehicles ordered impounded by the DPD that are being stored by a selected tower shall be stored on the lot in an area that is separate and apart from any other vehicles stored on the premises. (See **Exhibit 10**)

68. The DPD does not require the PTIU to adhere to the 2022 RFP or to the Contract requirements and standards imposed on the Towing Company Plaintiffs, as specifically, the PTIU has:

a. Failed to have sufficient equipment to perform towing and recovery service requested by DPD. The tow trucks owned and operated by the City of Detroit are unreliable and all but one at a point prior to the filing of this Complaint were not operational. Indeed, at the September 26, 2023 Detroit City Council meeting, contract nos. 3068650 and 3068662 from the Office of Contracting and Procurement for the purchase of four flatbed tow trucks at a total cost of $664,821.50 were referred to the Public Health and Safety Standing Committee. (See **Exhibit 11a** and **12**)

b. Failed to have sufficient facilities available to properly and safely store vehicles, as the DPD Grand River, Lyndon, Grinnell and Caniff lots are filled to or past capacity, yet Towing Company Plaintiffs are required to deliver all vehicles to DPD lots and attempt to create spaces to store them. (See **Exhibits 11b - f**)

c. Failed to provide convenient, well-managed, and courteously operated storage facilities for vehicles ordered impounded by the DPD at the Grand River, Lyndon, Grinnell and Caniff lots. (See **Exhibit 11b-f**)

    d. Failed to maintain an office at each storage facility with sufficient space for all necessary business capabilities. Where there are offices, they are mobile homes/trailers, which Towing Company Plaintiffs are not allowed to operate out of. (See **Exhibit 11b-f**)

    e. Failed to secure the facilities and for the safety and security of all towed vehicles at the Grand River, Lyndon, Grinnell and Caniff lots. (See **Exhibit 11b-f**)

    f. Failed to provide ADA compliant offices or restrooms. (See **Exhibit 11b-f**)

69. The Contracts allow the City to terminate the contract of a Towing Company Plaintiff for cause and upon the event of default, and states among other things as default:

    a. The Contractor violates any of the provisions of this Contract, or disregards applicable laws, ordinances, permits, licenses, instructions or orders of the City:

    b. The performance of the Contract, in the sole judgment of the City, is substandard, unprofessional, or faulty and not adequate to the demands of the task to be performed;

    c. The Contractor fails in any of the agreements set forth in this Contract;

    d. The Contractor admits its inability to pay its debts generally as they become due. (See **Exhibit 10**, p. 12, Section 11.02(a)(8, 9, 11, 12)}

70. The PTIU has violated provisions of the Contracts that the Towing Company Plaintiffs must adhere to, in that it:

    a. Disregards instructions and orders of the City (as set forth in the Contracts) that apply to Towing Company Plaintiffs;

b. Performs towing services in a substandard, unprofessional and/or faulty manner that is not adequate to the demands of the towing service tasks to be performed;

c. Fails in multiple aspects set forth in the Contracts; and

d. Is unable to pay its debts generally as they become due, to wit, having to use General Services Department funds instead of towing revenue to pay for land acquisition for towing and storage facilities, renovations to properties and the acquisition of new vehicles.

71.     Pursuant to the above, the City of Detroit and DPD do not hold the PTIU to the same standards, regulations and requirements as it does the Towing Company Plaintiffs.

**DPD has changed the terms of the Contracts with Towing Company Plaintiffs without a written amendment signed by both parties and approved by Detroit City Council**

72.     The Contracts state in the Scope of Work in Exhibit A at Section II(B)(1)(a) at p. 26:

> To the extent feasible, each authorized tower will tow on a rotational basis ***within the precinct in which they are located***. Precincts lacking adequate authorized tow companies to cover their respective areas shall have towers assigned on the basis of their geographical distance to the actual precinct station. (See **Exhibit 10)**

73.     The intent of the above provision in the Contracts is to keep the Towing Company Plaintiffs operating within their home precincts unless it is absolutely necessary to travel further.

74.     The Contracts state in the Scope of Work in Exhibit A at Section II(B)(1)(b) at p. 26:

>    The Department shall maintain a separate rotation for the towing of evidence vehicles. **Vehicles towed as evidence must be conveyed to 11631 Mt. Elliott Ct. or to another site as designated by the DPD**. The tow company shall be compensated according to the City's authorized towing rates. The rotation for evidence tows shall be constructed according to the same standards set forth in these Requirements. However, tow companies may be temporarily removed from the towing rotation in the event the money on the company's contract is depleted or the contract expires or otherwise is terminated. (See **Exhibit 10**)

75.     The Contracts state in the Scope of Work in Exhibit A at Section II(B)(1)(c) at p. 26:

>    The Department shall maintain a separate rotation for the towing of forfeiture vehicles. **Vehicles towed for forfeiture must be conveyed to 9425 Grinnell or to another site as designated by the DPD**. The tow company shall be compensated according to the City's authorized towing rates. The rotation for forfeiture tows shall be constructed according to the same standards set forth in these Requirements. However, tow companies may be temporarily removed from the towing rotation in the event the money on the company's contract is depleted or the contract expires or otherwise is terminated. (See **Exhibit 10**)

76.     Sections II(B)(1)(b) and (c) of the Scope of Work of the Contracts are the **only** provisions anywhere in the Contracts that require Towing Company Plaintiffs to take a vehicle that DPD authorizes them to tow to a DPD lot and not their own.

77.    The Contracts (**Exhibit 10**) further contemplated that Towing Company

Plaintiffs would be storing all but evidence and forfeiture vehicles at their own lots,

not at PTIU lots, as follows:

a.  Police authorized towers shall remain open for the release of
    vehicles from 7:00 a.m. – 10:00 p.m., Monday-Saturday. In the
    event the hours of operation of DPD tow lots are reduced, the hours
    during which police authorized towers must remain open for the
    release of vehicles shall be reduced to the same extent. Under no
    circumstances shall a police authorized tower be required to remain
    open for the release of vehicles beyond those hours required for
    DPD tow lots. ***It is the express intent of this provision to ensure
    that citizens have the same degree of access to their vehicles
    regardless of whether the vehicle is stored on a private tower's lot
    or a DPD tow lot***. (Scope of Work in Exhibit A at Section II(B)(2)(b)
    at p. 27)

b.  Tow companies shall maintain an office at each ***storage facility*** with
    sufficient space for all necessary business capabilities. (Scope of
    Work in Exhibit A at Section II(B)(2)(f) at p. 29)

c.  Police Authorized Towers must provide convenient, well-managed,
    and courteously operated storage facilities for ***vehicles ordered
    impounded by the DPD.*** (Scope of Work in Exhibit A at Section
    II(B)(2)(f) at p. 27)

d.  ***Police Authorized Towers shall be responsible for securing the
    facilities and for the safety and security of all towed vehicles***. Tow
    companies shall install and maintain a digital video recording
    system of the customer service area that includes audio. Each yard /
    storage facility shall include a digital video recording system but
    will not require audio. All video and recordings shall be retained for
    not less than 45 days. (Scope of Work in Exhibit A at Section
    II(B)(2)(f) at p. 29)

e. To facilitate audits and inspections by DPD personnel, *all vehicles ordered impounded by the DPD that are being stored by a selected tower shall be stored on the lot in an area that is separate and apart from any other vehicles stored on the premises*. (Scope of Work in Exhibit A at Section II(B)(2)(f) at p. 29)

f. Members of the Department are *authorized to place holds on vehicles or other items towed to a police authorized tower's facility*. Holds must be communicated in writing by officer requesting the hold to the tow company. In the event the officer requesting the hold fails to notify the tow company in writing, the tow company shall promptly notify the DPD Tow Monitor of the occurrence and shall be guided by the DPD Tow Monitor's direction. *Where a proper hold has been applied to a vehicle or other item, the tow company must not release the vehicle without written authorization from the Department.* (Scope of Work in Exhibit A at Section II(B)(2)(o) at p. 32)

g. *Police authorized towers must maintain a list of all vehicles that have remained unclaimed for a period of seven days or more*. The list shall be in a format prescribed by the Department and shall be transmitted to a prescribed e-mail address by noon each Monday. (Scope of Work in Exhibit A at Section II(B)(2)(p) at p. 32)

78. Towing Company Plaintiffs had to expend money, time and resources in order to be able to represent on their RFP applications that they could comply with the storage facility requirements for storing DPD impounded vehicles.

79. It is obvious from the sections of the Contracts set out in Paragraph 74, above that Towing Company Plaintiffs were expected to tow a great number of DPD impounded vehicles to their own storage lots, as they were required to have capacity to store a large number of vehicles; they were to keep DPD towed vehicles separate from other vehicles they had towed in; they had to supply security and constant video

of the area where DPD impounded vehicles would be stored; they had to be able to

store police hold vehicles for extended periods of time; and they had to send a weekly

update to DPD of the unclaimed vehicles on their lots.

80.     Section 18.03 of the Contracts states:

> No Amendment to this Contract shall be effective and binding
> upon the parties unless it expressly makes reference to this
> Contract, is in writing, is signed and acknowledged by duly
> authorized representatives of both parties, is approved by the
> appropriate City departments and the City Council, and is signed
> by the Chief Procurement Officer. (See **Exhibit 10**)

81.     There has been no written amendment to the Contracts signed by the

parties and approved by the City Council that would allow DPD to order Towing

Company Plaintiffs to take any DPD impounded vehicles other than those designated

as evidence or forfeiture to PTIU storage lots.

82.     In breach of the Contracts, DPD is requiring Towing Company Plaintiffs

to take nearly all non-evidence and non-forfeiture vehicles, including but not limited

to, abandoned vehicles, accident vehicles, stolen vehicles and partial stolen vehicles to

PTIU storage lots.

83.     In further breach of the Contracts, DPD is requiring Towing Company

Plaintiffs to transport vehicles far beyond the boundaries of their respective precincts.

84.     As a result of DPD's breach of the Contracts, Towing Company Plaintiffs

have lost and will continue to lose storage fees for DPD impound vehicles that should

have been towed to and stored in their yards, but which were instead ordered to PTIU

lots for storage.

**Agreement to Limit DPD Internal Towing to 25% of all Police Tows**

85.     The PTIU has been providing towing service as a part of the Detroit

Police Department since sometime in 2018.

86.     The version of the contract sent to the Towing Company Plaintiffs stated

in pertinent part at page 25:

> The Police Towing and Impound Unit shall serve as the
> Department's primary towing service[1].  When DPD Towing is not
> available, private towers shall be utilized in a manner consistent
> with the following Requirements and in accordance with the
> provisions of this Contract and local, state, and federal laws.
>
>> [1]Absent change of circumstances, the Department will
>> deploy its tow trucks in such manner and subject to the same
>> conditions, reservations, and discretions as set forth in the
>> former Chief of Police James E. Craig's letter to the Detroit
>> City Council, dated May 4, 2020.
>> (See **Exhibit 10**)

87.     Additionally, in response to Question 25 in the March 28, 2022

Addendum No. 2 to the RFP, the City of Detroit clearly stated:

> 25. Will the Department honor Former Chief Craig's agreement
> with City towing to only perform 25% of tows per months?
>
> ***Absent change of circumstances, the Department will deploy its
> tow trucks in such manner and subject to the same conditions,
> reservations, and discretions as set forth in the former Chief of
> Police James E Craig's letter to the Detroit City Council, dated
> May 4, 2020***. (See **Exhibit 13**)

88.     Former Chief of Police Craig's letter to the Detroit City Council dated May 4, 2020 stated in pertinent part (emphasis added):

> While the DPD and the City cannot relinquish any legal rights and does not do so by this letter, the DPD voluntarily commits to the following:
>
> 1. **The DPD will tow an amount of vehicles not to exceed 25% of all police authorized tows carried out during each calendar month**. This voluntary, self-imposed limitation on the number of vehicles the DPD tows will commence in June 2020. To prevent any unilateral change in the "not to exceed percentage", DPD agrees to notify City Council and the Board of Police Commissioners at least 30 days prior to doing so. **The Department will abide by its day-to-day policies and practices and not intentionally select or otherwise "handpick" towing opportunities that involve vehicles that may yield more revenue than other vehicles**.
>
> 2. Beginning in July 2020, the DPD will make available for inspection by the City Council, the Legislative Policy Division or a representative of the Detroit Towers Association or any police authorized towers records sufficient to show that the Detroit Police Department only towed 25% of all police authorized tows carried out during the prior month. Such inspection shall take place on the last Friday of each month, unless otherwise agreed to by the DPD on a case-by-case basis. The Department will provide copies of such records upon request. DPD will also honor reasonable record requests to show that it will abide by its day-to-day policies and practices and not intentionally select or otherwise "handpick" towing opportunities that involve vehicles that may yield more revenue than other vehicles.

3. **The DPD will take all necessary steps to resolve any and all legally valid outstanding invoices within 90 days following any private tower company's submission of any past due legally valid invoices and supporting documents**, exclusive of any delays caused by the company – including but not limited to being unresponsive to the Department's or OCFO's reasonable request for additional supporting documentation.

4. **The DPD will take proper steps to implement a bi-weekly payment process for all police authorized towers after the entry into contracts pursuant to the Request for Proposals described in paragraph 6 below**. It is understood that the successful establishment of the institution of this new payment process will require the participation and cooperation of the police authorized towers.

5. **Upon completion of the DPD's efforts to make its Grand River Tow Yard fully functional, police authorized towers will have the right to place any motor vehicle, boat, trailer, recreational vehicle, or other miscellaneous item on the Department's Grand River Tow Yard and to receive payment in the amount set forth in the established tow rates**.

6. No later than February 1, 2021, the DPD through the Chief Procurement Officer of the City shall submit a Request for Proposal for five-year towing contracts. The Request for Proposal shall be for a number of towing contractors in existence as of the date of submission of the Request for Proposal. The Request for Proposal shall give due weight to the years of experience of the police authorized towers. Any request for proposal shall comport with any legal requirements and is subject to the review and approval of the Office of Contracts and Procurement. **The DPD does not intend on changing the "not to exceed percentage" of 25% during the duration of the proposed contract period.** Any

contract issued is subject to the approval of City Council, and

7. **The DPD shall conduct a study of the business practices of police authorized towers in other jurisdictions and issue a recommendation to the Board of Police Commissioners that will normalize hours of operations according to nationwide standards**. (See **Exhibit 14**)

89.     Since the date of the approval of the Contracts, there have been no changes in circumstances that would warrant increasing the 25% cap on tows being performed by the PTIU.

90.     In direct violation of the express terms of the Contracts and the incorporated promises contained in former Police Chief Craig's May 4, 2020 letter to the Detroit City, the DPD has done the following:

a.   The PTIU have regularly towed in excess of 25% of all police authorized tows carried out each month.

b.   The PTIUs towers have handpicked towing opportunities that involve vehicles that may yield more revenue than other vehicles, including, but not limited to, all stolen vehicles.

c.   DPD has failed to resolve any and all legally valid outstanding invoices that have presented by the Towing Company Plaintiffs within 90 days of submission, and in fact, have failed to pay legally valid outstanding invoices that have been presented by the Towing Company Plaintiffs for years.

d.   Upon information and belief, the DPD Grand River Tow Yard became fully functional some time after Captain Craig's May 4, 2020 letter, however, Towing Company Plaintiffs have been ordered to bring motor vehicles, boats, trailers, recreational

vehicles and other miscellaneous items to the Grand River Tow Yard and have not received payment in the amount set forth in the established tow rates.

91.    The Contract between the City and the Towing Company Plaintiffs states at Paragraph 18.03 that no amendments to the Contract will be effective and binding unless in writing, signed and acknowledged by both parties and is approved by the appropriate City departments, City Council and is signed by the Chief Procurement Officer. (See **Exhibit 10**)

92.    No amendment has been authorized by the parties, the appropriate City departments, City Council and the Chief Procurement Officer to allow the PTIU to tow more than 25% of all police authorized tows each month or to order Towing Company Plaintiffs to tow all vehicles to PTIU lots.

**Failure to Pay Invoices**

93.    Under the previous permit system, under the process when there was no permit and contract and under the current contract with the DPD, DPD agreed to pay Towing Company Plaintiffs for towing services provided to the DPD in a timely manner after an invoice was submitted.

94.    Indeed, former Police Chief Craig's letter, incorporated into the Contracts, stated that "The DPD will take proper steps to implement a bi-weekly payment process for all police authorized towers after the entry into contracts pursuant to the Request for Proposals…" See **Exhibit 14**.

95.     Towing Company Plaintiffs have timely and regularly submitted invoices for payment for towing services performed under the previous permit system, under the process when there was no permit or contract and under the current contract to the DPD for payment dating back, in some cases, several years. (See **Exhibit 15** – sample invoices)

96.     The contract between the City of Detroit and the Towing Company Plaintiffs states at Article 7, Paragraph 7.20:

> Payment for Services provided under this Contract is governed by the terms of Ordinance No. 42-98, entitled "Prompt Payment of Vendors," being Sections 17-5-281 through 17-5-288 of the 2019 Detroit City Code.

97.     The City of Detroit Standardized Request for Proposal Template, distributed with the towing RFP, stated at Paragraph 25:

> All properly executed invoices submitted by the successful respondent will be paid in accordance with the City of Detroit Prompt Payment Ordinance.

98.     The City of Detroit Prompt Payment Ordinance, Sec. 17-5-284, states:

> Unless otherwise agreed to in a written contract or purchase order with a vendor, and subject to the provisions of Section 17-5-287 of this Code, **the responsible person shall** take all necessary steps to **ensure that payment for the vendor is mailed or delivered to the vendor within 45 business days after the vendor's delivery to the responsible person of an invoice** or other written request for payment issued pursuant to the terms of the contract or purchase order.

99.     Despite repeated requests, and in direct violation of the City of Detroit Prompt Payment Ordinance and the Contracts, the DPD has failed and refused to pay many of the outstanding invoices that it agreed to pay under the permit system, under the current contract, and during the period between the permit system and the current contract.

**Withholding of Towing and Storage Fees from Auction Proceeds**

100.     On a regular basis, the DPD holds auctions for vehicles deemed abandoned pursuant to MCL 257.252a and held by DPD and Towing Company Plaintiffs, according to the procedures set forth in MCL 257.252g.

101.     MCL 257.252g(2)(a) and (b) state (emphasis added):

> The money received from the public sale of the vehicle shall be applied in the following order of priority:
>
> (a) **Accrued towing and storage charges**. However, if the money received from the public sale does not satisfy the accrued towing and storage charges, **the towing company may collect the balance of those unpaid fees from the last titled owner, subject to section 252i.**
>
> (b) Expenses incurred by the police agency or the custodian of the vehicle.

102.     MCL 257.252i states (emphasis added):

> (1) **A towing service**, custodian of a vehicle, or both, **shall not be precluded from the recovery of towing fees** or, subject to subsection (2), storage fees **from the last titled owner of a vehicle deemed abandoned under section 252a or section 252b, or removed under section 252d**.

(2) If a vehicle is **released for disposition under section 252b or section 252g**, the amount of storage fees that may be collected is whichever 1 of the following is the least amount:
    (a) The daily storage rate established by contract or agreement with the law enforcement agency or unit of government that authorized the towing and storage of the vehicle.
    (b) The daily storage rate charged by the storage facility.
    (c) $1,000.00.

(3) Subsection (2) does not apply to a commercial vehicle or to a vehicle that is owned or leased by an entity other than an individual.

103.  MCL 257.252g(2)(a) clearly states that money received from the sale of an abandoned vehicle is first paid to cover the accrued towing and storage charges.

104.  The "However" provision of MCL 257.252g(2)(a) referring to MCL 257.252i applies only to the balance of the unpaid fees not collected from the auction proceeds, as clearly stated in the statute.

105.  The cap of MCL 257.252i only comes into play if the money received from the public sale does not satisfy the accrued towing and storage charges.

106.  The plain language of the statutes, when read together, clearly provide that:

a.  The money from the auction first goes to the tower for accrued towing and storage charges; and
b.  IF those funds do not cover the towing and storage, the tower may collect the balance from the vehicle owner, subject to the $1,000 storage cap of MCL 257.272i.

107.   In violation of MCL 257.252g(2)(a), DPD has, for years, capped the amount of storage fees that the Towing Company Plaintiffs receive from the proceeds of auctions of impounded/abandoned vehicles at $1,000 based upon misinformation regarding MCL 257.252i.

108.   Further, Section 46-2-93(b) of the Detroit City Ordinances states:

> An administrative fee, as determined by City Council, shall be charged to the owner of each vehicle towed by a police authorized tower and **shall be paid to the City when the vehicle is either redeemed or sold for a price that exceeds the towing and storage fees owed**.

109.   Contrary to the express provisions of Section 46-2-93(b), the City has been paying itself this administrative fee when a vehicle is sold for a price that does not exceed the towing and storage fees owed.

110.   The actions of DPD in withholding auction proceeds owed to Towing Company Plaintiffs for accrued towing and storage charged and keeping proceeds that were rightfully due to Towing Company Plaintiffs are in direct violation of MCL 257.252g(2)(a) and Section 46-2-93(b) of the Detroit City Ordinances and is a conversion of funds due to Towing Company Plaintiffs.

**Depriving Towing Company Plaintiffs of Sunday Storage Fees**

111.   When calculating storage due on vehicles towed and stored by Towing

Company Plaintiffs that are being auctioned, the DPD refuses to include any Sunday

that the vehicle has been in the custody of one of the Towing Company Plaintiffs as a

day of storage.

112.   There is no provision in the Michigan abandoned vehicle laws that states

that a towing company cannot be paid for a vehicle stored on a Sunday.

113.   There is no provision in the Detroit City Ordinances that states that a

towing company cannot be paid for a vehicle stored on a Sunday; in fact, Section 46-

2-64 states:

> Before the owner or person in charge of any impounded vehicle
> shall be permitted to remove the same from the custody of the
> Police Department, such owner or person in charge of the
> impounded vehicle shall furnish evidence of such person's identity
> and ownership, sign a receipt, and pay a redemption fee in the
> amount of the towing charge plus an impoundment fee. Such fee
> shall remain the same for the first 24 hours and then shall include
> **an additional per diem storage cost for each additional day or
> fraction of a day thereafter**.

114.   Section 46-2-93 of the Detroit City Ordinances states:

> Storage fees may be set on a per diem basis.

115.   There is no provision in the Contracts that states that Towing Company

Plaintiffs will not be paid for Sunday storage.

116.    Despite that fact that DPD impounded vehicles are routinely stored on Sundays and that there is no provision in any statute, ordinance, regulation or the Contracts to allow it, the DPD refused to pay Towing Company Plaintiffs storage fees for any Sunday that an impounded vehicle is stored.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF MCL 123.1402

117.    Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 116 of their Complaint.

118.    MCL 123.1402 states in pertinent part:

> Except as otherwise provided in section 3 or 3a, beginning on the effective date of this act, a local government or law enforcement agency shall not do any of the following:
>
> > (a) Operate a motor vehicle storage facility or towing operation

119.    MCL 123.1403(1) states:

> (1) If, on or before the effective date of this act, a local government or law enforcement agency is operating a motor vehicle storage facility or towing operation, that local government or law enforcement agency may continue to operate that motor vehicle storage facility or towing operation after the effective date of this act.

120.    The effective date of MCL 123.1403 as written above was September 30, 2018.

121.   On September 20, 2018, DPD presented to the Detroit Board of Police Commissioners ("BPOC") a plan to establish a towing and storage program to be run by DPD, with BPOC to provide oversight to that operation.

122.   While the BOPC voted to adopt a resolution approving the DPD towing and storage program, the program certainly was not operating as of September 20, 2018 and could not have been operating to the extent a private towing company providing towing services to the DPD under the then existing permit structure would have had to provide, to wit:

    a. BOPC, the department charged with oversight of the towing and storage program was unaware of the existence of the program until the September 18, 2018 meeting.

    b. The fact that the resolution concerning the establishment of the program was not included on the BOPC meeting agenda until less than 24 hours before the September 18, 2018 meeting.

    c. Tow trucks that were purchased and civilian vehicle operators were being hired, but training for those drivers would not begin until September 24, 2018.

    d. All descriptions of the program given at to the BOPC on September 20, 2018 were spoken in future, not present tense.

    e. When asked how the BOPC would fit into the program, AC White responded that currently the Board has oversight (of the private DPD towers under the permits), but that the oversight of the process by the BOPC would probably be much more engaged, meaning that the actual role of the BOPC, the entity charged with oversight, had not been established.

      f.  No organizational chart was provided at the September 20, 2018 meeting and the BOPC was told that one could not be provided.

123.  The only chance that the BOPC would give to members of the public commenting on, questioning or raising concerns about the program was scheduled for after the resolution had been voted upon.

124.  DPD was obviously pushing the vote on the resolution regarding the establishment of the DPD towing and storage program to make it look, on paper, that they had a towing and storage program in operation before September 30, 2018.

125.  A private towing company submitting a proposal under the 2022 RFP to provide towing for DPD was required to establish the following:

      a.  Minimum 5 years of experience providing law enforcement towing services.

      b.  Three similar towing projects (law enforcement towing) with description of services provided and length of service.

      c.  Identify key personnel working on towing projects.

      d.  Provide CPA certified financial statements for the previous three years.

      e.  Provide an organizational chart indicating the key personnel who would provide services and a resume for each. (See **Exhibit 4,** p. 3)

      f.  Organizational chart, resumes, client list, brochure and executive summary. (See **Exhibit 4,** p.5)

      g.  City of Detroit Income Tax and Revenue Tax Clearances. (See **Exhibit 4,** p. 6)

h.  That their submission was complete: "Accuracy and completeness are essential. Omissions and ambiguous or equivocal statements will be viewed unfavorably and may be considered in the evaluation." (See **Exhibit 4,** p. 6)

i.  The firm's financial solvency, fiscal responsibility and financial capability. (See **Exhibit 4,** p. 6)

j.  Age of the business and average number of employees during the last 5 years. (See **Exhibit 4,** p. 7)

k.  Evidence of licenses or registrations required to provide towing services.  (See **Exhibit 4,** p. 7)

l.  Background clearances for all owners, directors, managers and employees. (See **Exhibit 4,** Attachment 1, p. 1)

m. Evidence to show company is properly insured. (See **Exhibit 4,** Attachment 1, p. 1)

n.  List of all licenses held. (See **Exhibit 4,** Attachment 1, p. 1)

o.  List of all tow trucks owned. (See **Exhibit 4,** Attachment 1, p. 1)

p.  List of all activities conducted at premises. (See **Exhibit 4,** Attachment 1, p. 1)

q.  Copies of current deeds to all properties to be used. (See **Exhibit 4,** Attachment 1, p. 1)

r.  That they will agree to operate in accordance with the highest industry standards and practices. (See **Exhibit 4,** Attachment 1, p. 6)

s.  That they shall remain open 7am to 10pm Monday through Saturday for the release of vehicles. (See **Exhibit 4,** Attachment 1, p. 6)

t.   To conduct themselves in a professional manner at all times and may not cause the public unreasonable delay. (See **Exhibit 4,** Attachment 1, p. 6)

u.   That they will have sufficient facilities, equipment and personnel to perform any towing and recovery service requested by DPD. (See **Exhibit 4,** Attachment 1, p. 7)

v.   That they have adequate space, equipment and personnel to handle towing requests. (See **Exhibit 4,** Attachment 1, p. 7)

w.  That they provide convenient, well-managed and courteously operated storage facility for vehicles ordered impounded by DPD. (See **Exhibit 4,** Attachment 1, p. 7)

x.   That they maintain an office at each storage facility with sufficient space for all necessary business capabilities. (See **Exhibit 4,** Attachment 1, p. 7)

y.   That they maintain computers with software capabilities to collect vehicle information and other data, telephones, fax machines for servicing the customers and DPD. (See **Exhibit 4,** Attachment 1, p. 7)

z.   That they maintain a toilet facility for use by customers. (See **Exhibit 4,** Attachment 1, p. 8)

aa. That their facilities are secure for the safety and security of all towed vehicles. (See **Exhibit 4,** Attachment 1, p. 8)

bb. That they have digital video recording system of the customer service area that includes audio. (See **Exhibit 4,** Attachment 1, p. 8)

cc. That their yard/storage facility includes a digital video recording system. (See **Exhibit 4,** Attachment 1, p. 8)

dd. That all land and structures that make up their facilities comply with all local, state and federal requirements. (See **Exhibit 4,** Attachment 1, p. 8)

ee. That signage as directed by the Tow Monitor be conspicuously posted in all customer service areas. (See **Exhibit 4,** Attachment 1, p. 8)

ff. That data on each vehicle be stored electronically. (See **Exhibit 4,** Attachment 1, p. 8)

gg. That all vehicles towed are photographed before hookup and after the vehicle has been taken off the tow truck. (See **Exhibit 4,** Attachment 1, p. 8)

hh. That they maintain in accordance with generally accepted accounting principles, complete and accurate books of account and records relating to all items of income received and expenses incurred in regard to police authorized towing. (See **Exhibit 4,** Attachment 1, p. 8)

ii. That they must accept cash and at least three major credit cards. (See **Exhibit 4,** Attachment 1, p. 9)

126. At the time of the presentation to BOPC on September 20, 2018, DPD could not comply with most, if not all of the requirements that private towers needed to meet in order for their submission to the RFP to be considered for DPD towing.

127. Further, the contract that the private towers chosen through the RFP process required that those companies have capacity and facilities as more thoroughly set forth in Paragraph 63 and 125 above.

128. Prior to September 30, 2018, the PTIU could not meet the standards, requirements and capacities required of the private towers then performing police authorized towing under the permits, or of the 2022 RFP or of the contract imposed on the Towing Company Plaintiffs, as specifically, the PTIU has:

a. Failed to have sufficient equipment to perform towing and recovery service requested by DPD. The tow trucks owned and operated by the City of Detroit are unreliable and all but one at the time of the filing of this Complaint were not operational. Indeed, at the September 26, 2023 Detroit City Council meeting, contract nos. 3068650 and 3068662 from the Office of Contracting and Procurement for the purchase of four flatbed tow trucks at a total cost of $664,821.50 were referred to the Public Health and Safety Standing Committee. (See **Exhibit 12**)

b. Failed to have sufficient facilities available to properly and safely store vehicles, as the DPD Grand River, Lyndon, Grinnell and Caniff lots are filled to or past capacity, yet Towing Company Plaintiffs are required to deliver all vehicles to DPD lots and attempt to create spaces to store them. (See **Exhibit 11**)

c. Failed to provide convenient, well-managed, and courteously operated storage facilities for vehicles ordered impounded by the DPD at the Grand River, Lyndon, Grinnell and Caniff lots. (See **Exhibit 11**)

d. Failed to maintain an office at each storage facility with sufficient space for all necessary business capabilities. Where there are offices, they are mobile homes/trailers, which Towing Company Plaintiffs are not allowed to operate out of. (See **Exhibit 11**)

e. Failed to secure the facilities and for the safety and security of all towed vehicles at the Grand River, Lyndon, Grinnell and Caniff lots. (See **Exhibit 11**)

129.   Based upon the above, by September 30, 2018, the City of Detroit was not operating a motor vehicle storage facility or towing operation sufficient to meet the standards, requirements and capacities that the towers under the permits had to adhere to, that the 2022 RFP applicants had to meet, or that was imposed upon the Towing Company Plaintiffs in the 2022 contract.

130.   Further, while the Mayor and the Police Chief signed a Joint Directive describing a towing and storage operation, and the BOPC approved a resolution to start a towing and storage operation, on September 30, 2018, the City of Detroit was not operating a motor vehicle storage facility or towing operation that would meet the standards and requirements imposed upon private towers performing DPD authorized towing, and at best was test driving a couple of tow trucks.

131.   Further, the Detroit City Council did not approve the actions by the Mayor, Chief of Police and BOPC until well after September 30, 2018.

132.   As of September 30, 2018, the City of Detroit was not operating a motor vehicle storage facility or towing operation.

133.   Accordingly, the City of Detroit is operating its current towing operation and motor vehicle storage facility in violation of MCL 123.1402.

134.   MCL 123.1404 states:

> If a local government or law enforcement agency violates section 2, an individual or entity may bring an action seeking injunctive relief against the local government or law enforcement agency. If a court determines a local government or law enforcement agency is violating section 2, the court shall issue an injunctive order requiring the local government or law enforcement agency to cease and desist from violating section 2. An injunctive order issued under this section becomes effective 60 days after the injunctive order is entered by the court. Any action taken by a local government or law enforcement agency to ensure compliance with section 2 or any injunctive order issued under this section is not considered a violation of the injunctive order for purposes of any fine under this section. A local government or law enforcement

agency that violates an injunctive order under this section is subject to a civil fine of not more than $1,000.00 for each day of violation, up to a maximum of $10,000.00. An individual or entity that brings an action under this section may recover costs and reasonable attorney fees.

135. Pursuant to MCL 123.1404, Plaintiff Towing Companies request this Court issue an injunctive order requiring the City of Detroit to cease and desist from operating its towing operation and motor vehicle storage facility.

WHEREFORE, Towing Company Plaintiffs request that this Court enter an Injunction ordering Defendant and DPD to cease and desist from operating its towing operation and motor vehicle storage facility and award Towing Company Plaintiffs costs and attorney fees pursuant to MCL 123.1404. Towing Company Plaintiffs further pray that this court enter a judgment in their favor and against Defendant, City of Detroit, in an amount in excess of $75,000 plus interest, costs and attorney's fees and that this Court award Plaintiff such other and further relief as it deems just and reasonable under the circumstances.

## COUNT II – VIOLATION OF THE TOWING COMPANY PLAINTIFFS' RIGHT TO EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION

136. Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 135 of their Complaint.

137. A corporation is a `person' within the meaning of the equal protection and due process of law clauses. *ANR Pipeline Co. v. Michigan Public Service Commission*,

608 F. Supp. 43, 46 (W.D. Mich. 1984), citing. *Grosjean v. American Press Co.*, 297 U.S. 233 (1936)

138.    Towing Company Plaintiffs are all "persons" for the purpose of the Fourteenth Amendment of the United States Constitution and the Michigan Constitution.

139.    The Fourteenth Amendment of the United States Constitution guarantees equal protection under the law.

140.    The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

141.    A municipality violates the Fourteenth Amendment when a Plaintiff alleges that they have been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.

142.    Courts have long recognized that the equal protection guarantee of the 14th Amendment extends to persons who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials.

143.    The City of Detroit and DPD towing policy, standards and requirements placed upon Towing Company Plaintiffs through their ordinances, the 2022 RFP and the Contracts between the parties, on their face and as applied, unconstitutionally

abridge Towing Company Plaintiffs' affirmative right to equal protection of the laws, as the PTIU, which provides the same towing and storage services for DPD, does not have to meet those same standards and requirements.

144.    The City of Detroit and DPD towing policy and requirements placed upon Towing Company Plaintiffs through their ordinances, the 2022 RFP and the Contracts between the parties, on their face and as applied, treat Towing Company Plaintiffs less favorably than they treat other similarly-situated entities because Towing Company Plaintiffs are held to much higher standards and requirements than the PTIU for providing the same service to the City of Detroit.

145.    Defendant City of Detroit has intentionally treated Towing Company Plaintiffs differently from others similarly situated, the PTIU, in that they have specifically required the Towing Company Plaintiffs to adhere to certain requirements and standards in order to be placed on and remain on the towing rotation for towing for the DPD while the PTIU is not required to adhere to the same requirements and standards.

146.    The City of Detroit, through its towing ordinances, the requirements of the 2022 RFP and the requirements of the towing Contracts between the parties, treats Towing Company Plaintiffs less favorably than it treats the similarly situated PTIU.

147.    This less-favorable treatment is not supported by a compelling governmental interest sufficient to justify its enactment or enforcement against Towing

Company Plaintiffs, in that it is unsafe, unproductive and dangerous to allow the PTIU to perform the same towing and storage services without the same requirements that are imposed on Towing Company Plaintiffs.

148.   This less-favorable treatment is not the least restrictive means to accomplish any permissible government purpose sought to be served by the ordinances, 2022 RFP and contract requirements.

149.   The 2022 RFP for DPD Towing Services required applicant towers, including Towing Company Plaintiffs, to provide the standards and requirements for services and facilities as more thoroughly set forth in the fact sections above.

150.   While the RFP required the applying towing companies, including Towing Company Plaintiffs, to provide and abide by the items set forth in the fact sections above, the PTIU was not in 2018, at the time of the issuance of the 2022 RFP and is not currently required to do the same, as more thoroughly set forth in the fact sections, above.

151.   The Contracts between the City of Detroit and the Towing Company Plaintiffs set forth additional requirements regarding capacity and facilities, as more thoroughly set forth in the fact sections above.

152.   As an authorized tower for the City of Detroit and the DPD, just like the Towing Company Plaintiffs, the PTIU must be required to adhere to the same

requirements as those imposed upon the Towing Company Plaintiffs through the contract between the parties.

153.    The PTIU is not required to adhere to the 2022 RFP and contract requirements and standards imposed on the Towing Company Plaintiffs, as specifically set forth in facts section.

154.    There is no rational basis for the difference in treatment received by Towing Company Plaintiffs from the PTIU.

155.    There is no legitimate government interest to substantiate the difference in treatment received by Towing Company Plaintiffs from the PTIU.

156.    Towing Company Plaintiffs have suffered damages, including immediate and irreparable injury, as a direct and proximate result of Defendant's violation of their rights as alleged herein.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court:

A. Grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000;

B. Enter an injunction either restricting DPD from operating PTIU because it is in violation of MCL 123.1403, or in the alternative, require DPD to cease and desist using PTIU as a towing operation and storage facility until such time as PTUI conforms with all regulations, policies, and requirements

imposed upon Towing Company Plaintiffs by the RFP, the contract between the City of Detroit and the Towing Company Plaintiffs and the Detroit towing ordinances; and

C. Award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

**COUNT III – BREACH OF CONTRACT – PROMPT PAYMENT**

157.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1-156 of their Complaint.

158.   Towing Company Plaintiffs and the DPD entered into permits for each Plaintiff to perform towing services for DPD from approximately December 2010 to September 2021. A copy of one of the permits is attached as **Exhibit 7**.

159.   Pursuant to those permits, DPD offered and agreed to pay Towing Company Plaintiffs for the towing services performed pursuant to the terms of the City of Detroit Prompt Payment Ordinance, or within 45 days of receipt of an invoice from Towing Company Plaintiffs.

160.   By entering into the permits, Towing Company Plaintiffs accepted DPD's offer and performed the required towing services.

161.   In consideration, Towing Company Plaintiffs agreed to perform the towing services in return for DPD to pay for those services.

162.   The elements of a contract, offer, acceptance and consideration were met in the agreements between the parties with the permits.

163.   From approximately September 2021 to December 21, 2022, Towing Company Plaintiffs and the DPD had an implied agreement for each Plaintiff to perform towing services for DPD.

164.   Pursuant to that implied agreement, DPD offered and agreed to pay Plaintiffs for the towing services performed.

165.   By entering into the implied agreement, Towing Company Plaintiffs accepted DPD's offer and performed the required towing services.

166.   In consideration, Towing Company Plaintiffs agreed to perform the towing services in return for DPD to pay for those services.

167.   Absent a written agreement to the contrary, DPD is required to pay a vendor according to the terms of the City of Detroit Prompt Payment Ordinance, or within 45 days of receipt of an invoice from Towing Company Plaintiffs.

168.   The elements of a contract, offer, acceptance and consideration were met in the agreements between the parties with the implied agreement between the parties.

169.   Towing Company Plaintiffs and the DPD entered into Contracts for each Plaintiff to perform towing services for DPD beginning December 21, 2022. (See **Exhibit 10**)

170.   Pursuant to those Contracts, DPD offered and agreed to pay Towing Company Plaintiffs for the towing services performed pursuant to the terms of the City of Detroit Prompt Payment Ordinance, or within 45 days of receipt of an invoice from Towing Company Plaintiffs.

171.   By entering into the Contracts, Towing Company Plaintiffs accepted DPD's offer and performed the required towing services.

172.   In consideration, Towing Company Plaintiffs agreed to perform the towing services in return for DPD to pay for those services.

173.   The elements of a contract, offer, acceptance and consideration were met in the agreements between the parties with the Contracts.

174.   Towing Company Plaintiffs have timely submitted numerous invoices for towing services performed under the permits which, in breach of the agreement between the parties and in violation of the City of Detroit Prompt Payment Ordinance, DPD has failed to pay. Examples of invoices that DPD has failed to pay under the permits are included as **Exhibit 15**.

175.   Towing Company Plaintiffs have timely submitted numerous invoices for towing services performed under the implied agreements which, in breach of the agreement between the parties and in violation of the City of Detroit Prompt Payment Ordinance, DPD has failed and refused to pay. Examples of invoices that DPD has failed to pay under the implied contracts are included as **Exhibit 15.**

176.    Towing Company Plaintiffs have timely submitted numerous invoices for towing services performed under the latest contract between the parties which, in breach of the agreement between the parties and in violation of the City of Detroit Prompt Payment Ordinance, DPD has failed and refused to pay. Examples of invoices that DPD has failed to pay under the latest contracts are included as **Exhibit 15.**

177.    In breach of the agreements for the permits, DPD has failed to pay numerous invoices owed to Towing Company Plaintiffs in excess of $75,000.

178.    In breach of the implied agreements, DPD has failed to pay numerous invoices owed to Towing Company Plaintiffs in excess of $75,000.

179.    In breach of the latest contract, DPD has failed to pay numerous invoices owed to Towing Company Plaintiffs.

180.    Despite repeated requests, Defendant City of Detroit and the DPD have failed and refused to pay Towing Company Plaintiffs the overdue balances for the invoices for the permits, implied agreements and current contract.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

**COUNT IV – VIOLATION OF MCL 257.252g(2)(a) –
WITHHOLDING OF ACCRUED TOWING AND STORAGE CHARGES**

181.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1-180 of their Complaint.

182.   MCL 257.252g(2)(a) requires that money received from the public sale of a vehicle that has been determined to be abandoned under MCL 257.252a or removed pursuant to MCL 257.252d be paid first to the tower to cover accrued towing and storage charges.

183.   Nothing in MCL 257.252g or in any other section of the Michigan abandoned vehicle statutes, MCL 257.252a, et seq., limits the amount of the accrued towing and storage charges that should be paid to a tower from auction proceeds.

184.   Despite the clear language of MCL 257.252g(2)(a), the DPD for years has consistently limited accrued towing and storage charged paid to the Towing Company Plaintiffs to $1,165, representing $125 for towing, $40 Secretary of State fee and $1,000 in storage. See Ex -

185.   Over the years, in violation of the clear language of MCL 257.252g(2)(a), DPD has been withholding accrued towing and storage charges from proceeds of auctions of abandoned vehicle rightfully due to Towing Company Plaintiffs.

186.   As a result of DPD's violation of MCL 257.252g(2)(a) and withholding of funds rightfully due to Towing Company Plaintiffs, Towing Company Plaintiffs have suffered losses in excess of $75,000.

187.   Towing Company Plaintiffs must be repaid the amounts withheld by DPD in order to be made whole.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

### COUNT V – UNJUST ENRICHMENT - WITHHOLDING OF ACCRUED TOWING AND STORAGE CHARGES

188.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1-187 of their Complaint.

189.   The elements for a claim of unjust enrichment are:

   a.  receipt of a benefit by the defendant from the plaintiff, and

   b.  an inequity resulting to plaintiff from defendant's retention of the benefit. See *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc*., 302 Mich. App. 59 (Mich. Ct. App. 2013)

190.   MCL 257.252g(2)(a) states that the money received from the public sale of a vehicle deemed abandoned **shall** be applied in the following order of priority:

b.   **Accrued towing and storage charges**. However, if the money received from the public sale does not satisfy the accrued towing and storage charges, the towing company may collect the balance of those unpaid fees from the last titled owner, subject to section 252i.

191.   Nothing in MCL 257.252g or in any other section of the Michigan abandoned vehicle statutes, MCL 257.252a, et seq., limits the amount of the accrued towing and storage charges that should be paid to a tower from auction proceeds.

192.   Nothing in MCL 257.252g allows the DPD to pay itself an administrative fee out of the auction proceeds before Towing Company Plaintiffs get paid for accrued towing and storage charges.

193.   Despite the clear language of MCL 257.252g(2)(a), the DPD for years has consistently limited accrued towing and storage charged paid to the Towing Company Plaintiffs to $1,165, representing $125 for towing, $40 for a statutory Secretary of State fee and $1,000 in storage.

194.   The Towing Company Plaintiffs' accrued and earned storage fees were kept by the DPD and the City of Detroit after auctions from auction proceeds instead of being rightfully paid to the Towing Company Plaintiffs, giving them the receipt of a benefit that should have been paid to Plaintiffs.

195.   The storage fees were due to Towing Company Plaintiffs and MCL 257.252g(2)(a) requires all accrued towing and storage charges be paid first from proceeds from the public sale of a vehicle deemed abandoned, and DPD and the City of Detroit kept the storage fees for themselves, there was an inequity resulting to the Towing Company Plaintiffs from the DPD and City of Detroit's retention of the storage fees.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT VI – UNJUST ENRICHMENT – WITHHOLDING OF SUNDAY STORAGE FEES

196.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 195 of their Complaint.

197.   The elements for a claim of unjust enrichment are:

  c.   receipt of a benefit by the defendant from the plaintiff, and

  d.   an inequity resulting to plaintiff from defendant's retention of the benefit. See *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc.*, 302 Mich. App. 59 (Mich. Ct. App. 2013)

198.   MCL 257.252g(2)(a) states that the money received from the public sale

of a vehicle deemed abandoned **shall** be applied in the following order of priority:

> e.   **Accrued towing and storage charges**. However, if the money received from the public sale does not satisfy the accrued towing and storage charges, the towing company may collect the balance of those unpaid fees from the last titled owner, subject to section 252i.

199.   Nowhere does MCL 257.252g(2)(a), nor does any other portion of the

Michigan abandoned vehicle statutes (MCL 257.252a, et seq.) say that no storage fees

can be charged for Sunday storage.

200.   Nowhere do the Detroit City Ordinances say that no storage fees can be

charged for Sunday storage.

201.   Nowhere in the current contract for providing towing services for the

DPD, nor in the previous permits, nor in any agreement signed by any of the Towing

Company Plaintiffs does it say that no storage fees can be charged for Sunday storage.

202.   Despite the fact that there is absolutely no basis for withholding fees

charged for storing vehicles on Sundays, the DPD has, for years, withheld from

proceeds payable from the public sale of vehicles deemed abandoned, storage fees

charged for Sunday storage.

203.   The storage fees for Sunday storage, which rightfully should have been

paid to the Towing Company Plaintiffs, were not charged by the DPD at auction,

giving DPD and the City of Detroit the receipt of a benefit that should have been paid to Towing Company Plaintiffs.

204.   As the Sunday storage fees were due to Towing Company Plaintiffs and MCL 257.252g(2)(a) requires all accrued towing and storage charges be paid first from proceeds from the public sale of a vehicle deemed abandoned, and DPD and the City of Detroit kept the storage fees over $1,000 for themselves, there was an inequity resulting to the Towing Company Plaintiffs from the DPD and City of Detroit's retention of the Sunday storage fees.

205.   As a result of Defendant's withholding of Sunday storage fees from Plaintiff Towing Companies have suffered damages.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT VII – BREACH OF CONTRACT – MORE THAN 25% OF TOWING

206.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 204 of their Complaint.

207.   On or about December 22, 2022, Defendant City of Detroit offered Towing Company Plaintiffs a Contract whereby Towing Company Plaintiffs would

provide wrecker and storage services for DPD towing purposes in return for
Defendant's promise to, among other things, pay Towing Company Plaintiffs for those
services.

208.   Shortly thereafter, Plaintiff Towing Companies accepted the offered
contract and began providing police towing services to DPD.

209.   The elements of a contract between the parties, offer, acceptance and
consideration have been met.

210.   DPD has a substandard and unlawful internal towing operation, the PTIU,
funded and run by the City of Detroit, to provide police towing for DPD.

211.   The version of the contract sent to the Towing Company Plaintiffs stated
in pertinent part at page 25:

> The Police Towing and Impound Unit shall serve as the
> Department's primary towing service[1].  When DPD Towing is not
> available, private towers shall be utilized in a manner consistent
> with the following Requirements and in accordance with the
> provisions of this Contract and local, state, and federal laws.
>
> > [1]Absent change of circumstances, the Department will
> > deploy its tow trucks in such manner and subject to the same
> > conditions, reservations, and discretions as set forth in the
> > former Chief of Police James E. Craig's letter to the Detroit
> > City Council, dated May 4, 2020.

212.    Additionally, in response to Question 25 in the March 28, 2022 Addendum No. 2 to the RFP, the City of Detroit clearly stated:

>    25. Will the Department honor Former Chief Craig's agreement with City towing to only perform 25% of tows per months?
>
>    **Absent change of circumstances, the Department will deploy its tow trucks in such manner and subject to the same conditions, reservations, and discretions as set forth in the former Chief of Police James E Craig's letter to the Detroit City Council, dated May 4, 2020.**

213.    Pursuant to the contract and the RFP Addendum 2, Defendant promised Towing Company Plaintiffs that it would abide by the provisions set forth in former Chief of Police James E. Craig's letter to Detroit City Council dated May 4, 2020.

214.    Chief Craig's May 4, 2020 letter promised, among other things:

>    **The DPD will tow an amount of vehicles not to exceed 25% of all police authorized tows carried out during each calendar month**. This voluntary, self-imposed limitation on the number of vehicles the DPD tows will commence in June 2020. To prevent any unilateral change in the "not to exceed percentage", DPD agrees to notify City Council and the Board of Police Commissioners at least 30 days prior to doing so. **The Department will abide by its day-to-day policies and practices and not intentionally select or otherwise "handpick" towing opportunities that involve vehicles that may yield more revenue than other vehicles.**

215.    Chief Craig's May 4, 2020 promise that Defendant and DPD agreed to abide by was that the PTIU would tow no more than 25% of all police tows, so that the

Towing Company Plaintiffs would tow at least 75% of all police authorized tows in a calendar month.

216. DPD used Chief Craig's promise and its own promise to induce Towing Company Plaintiffs to enter into the Contracts to provide police towing, assuring them that the PTIU would tow at most 25% of police authorized tows each month, and that they would then split the remaining 75% of police authorized tows.

217. In breach of the contract and direct promise of Defendant and DPD to Towing Company Plaintiffs, DPD has given the PTIU more than 25% of all police authorized tows in many calendar months since the contract was implemented.

218. Towing Company Plaintiffs have been damaged by DPD's and the City of Detroit's breach of contract in the amount of the towing and storage fees taken by the PTIU in excess of 25% of all police authorized tows in each calendar month.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

**COUNT VIII – BREACH OF CONTRACT – DIVERTING STORAGE FROM TOWING COMPANY PLAINTIFFS' STORAGE LOTS**

219.    Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 218 of their Complaint.

220.    The Contracts between the parties specifically require that Towing Company Plaintiffs tow evidence and forfeiture vehicles to PTIU designated lots for storage.

221.    Nothing in the Contracts direct or require Towing Company Plaintiffs to tow any vehicles except evidence and forfeiture vehicles to PTIU designated lots for storage.

222.    Indeed, the Contracts specifically require Towing Company Plaintiffs to:

    a.  Provide convenient, well-managed and courteously operated storage facilities for vehicles ordered impounded by the DPD.

    b.  Be responsible for securing their storage facilities for the safety and security of all towed vehicles.

    c.  Install and maintain digital video recording of their yard and storage facilities.

    d.  Store vehicles ordered impounded by DPD in an area that is separate and apart from any other vehicle stored on the premises.

    e.  Store vehicles and other items that DPD officers have placed holds on.

    f.  Refuse to release a DPD hold vehicle without written authorization from DPD.

g. Maintain a list of all DPD impounded vehicles that have remained on a Towing Company Plaintiff's storage lot for seven days or more and transmit that list weekly to DPD. (See **Exhibit 10**)

223. Clearly, the Contracts between the parties anticipate that all DPD impounded vehicles, except those that are designated as evidence or forfeiture, are to be towed to Towing Company Plaintiffs' lots for storage.

224. The Contracts require that any amendment to the Contracts must be in writing, signed by both parties and approved by the City Council.

225. There has been no amendment to the Contracts that would allow DPD to require Towing Company Plaintiffs to tow DPD impounded vehicles, other than forfeiture and evidence vehicles, to any lot other than Towing Company Plaintiffs' storage lots.

226. In breach of the Contracts, DPD has ordered Towing Company Plaintiffs to tow nearly all DPD impounded vehicles that are not designated evidence or forfeiture to PTIU lots instead of Towing Company Plaintiffs' storage lots.

227. Additionally, DPD has been requiring Towing Company Plaintiffs to tow vehicles to PTIU lots well outside of the DPD precinct that a Towing Company Plaintiff services, requiring Towing Company Plaintiffs to travel 20 to 30 minutes away from the nearest PTIU lot, costing Towing Company Plaintiffs time and mileage, and jeopardizing their ability to respond in the required 20 minutes to additional DPD calls for towing.

228. As a result of DPD's breach of the Contracts, Towing Company Plaintiffs have suffered damages, in that Towing Company Plaintiffs were entitled to storage fees for the vehicles wrongfully directed to PTUI storage lots and did not get or have any chance to receive those storage fees.

229. Towing Company Plaintiffs will continue to suffer damages as long as DPD keeps directing Towing Company Plaintiffs to tow DPD impounded vehicles to PTUI storage lots.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT IX – COMMON LAW CONVERSION

230. Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 229 of their Complaint.

231. Defendant and DPD wrongfully exercised dominion and control over the accrued towing and storage fees withheld from auction proceeds of abandoned vehicles, as more thoroughly described in Counts IV - VI, and thereby converted those funds to Defendant's own use.

232.    Defendant and DPD wrongfully exercised dominion and control over the accrued towing and storage fees withheld from auction proceeds of abandoned vehicles, as more thoroughly described in Counts IV – VI, and thereby converted those funds to Defendant's own use.

233.    Defendant and DPD wrongfully exercised dominion and control over the accrued storage fees that Towing Company Plaintiffs would have received had non-evidence and non-forfeiture DPD impounded vehicles been ordered to PTIU storage lots, instead of to Towing Company Plaintiffs lots, as more thoroughly described in Count VII, and thereby converted those funds to Defendant's own.

234.    These actions by Defendant are unlawful business practices designed to exercise dominion and control over the property of Towing Company Plaintiffs.

235.    Defendant utilized the funds and converted them to its own use.

236.    Due to these acts of conversion, Towing Company Plaintiffs were damaged, as they were deprived of funds from the auction proceeds and for Sunday storage fees wrongfully withheld by Defendant.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT X – STATUTORY CONVERSION

237.    Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 236 of their Complaint

238.    MCL 600.2919a(1) states in pertinent part:

> A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

239.    Defendant and DPD wrongfully exercised dominion and control over the accrued towing storage fees withheld from auction proceeds of abandoned vehicles, as more thoroughly described in Counts IV – VI, and thereby converted those funds to Defendant's own use.

240.    Defendant and DPD wrongfully exercised dominion and control over the accrued towing storage fees withheld from auction proceeds of abandoned vehicles, as more thoroughly described in Counts IV – VI, and thereby converted those funds to Defendant's own use.

241.   Defendant and DPD wrongfully exercised dominion and control over the accrued storage fees that Towing Company Plaintiffs would have received had non-evidence and non-forfeiture DPD impounded vehicles been ordered to PTIU storage lots, instead of to Towing Company Plaintiffs lots, as more thoroughly described in Count VII, and thereby converted those funds to Defendant's own.

242.   These actions by Defendant are unlawful business practices designed to exercise dominion and control over the property of Towing Company Plaintiffs.

243.   Defendant utilized the funds and converted them to its own use.

244.   Due to these acts of conversion, Towing Company Plaintiffs were damaged, as they were deprived of funds from the auction proceeds and for Sunday storage fees wrongfully withheld by Defendant.

245.   Due to the damage suffered by Towing Company Plaintiffs, they may bring an action under MCL 600.2919a.

246.   Further, Towing Company Plaintiffs are entitled to 3 times the amount of actual damages sustained, plus costs and attorney fees.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, tripled pursuant to MCL 600.2919a, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT XI - FRAUD

247.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 246 of their Complaint.

248.   The elements of fraud are: (1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury. *City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242 (Mich. 2005)

249.   In the Contracts and Amendment 2 of the RFP, Defendant and DPD made a material representation that the PTIU would handle no more than 25% of authorized police tows for DPD in any calendar month.

250.   As the PTIU has handled more than 25% of authorized police tows for DPD in any calendar month since the contract began, Defendant's representation was false.

251.   When Defendant made the representation regarding the PTIU towing, it knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion.

252.    When Defendant made the representation, it made it with the intention that it should be acted upon by the Towing Company Plaintiffs.

253.    In entering into the Contracts with Defendant, the Towing Company Plaintiffs acted in reliance upon Defendant's material representation.

254.    The Towing Company Plaintiffs have suffered injury as a result of relying on Defendant's material representation, to wit, loss of the tows in excess of 25% of all police tows that the PTIU has performed each month that should have gone to Towing Company Plaintiffs.

WHEREFORE, Towing Company Plaintiffs respectfully request this Honorable Court grant a judgment in their favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

## COUNT XII – INJUNCTIVE RELIEF

255.    Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 254 of their Complaint.

256.    Towing Company Plaintiffs have adhered to all provisions of the Contracts between Defendant and Plaintiffs.

257.    Defendant has breached the Contracts between Defendant and Towing Company Plaintiffs by:

    a.  Failing to pay Towing Company Plaintiffs pursuant to the terms of the contract;

    b.  Failing to limit the monthly police authorized tows allotted to the PTIU to 25% of all police tows; and

    c.  Failing to allow Towing Company Plaintiffs to tow all non-forfeiture and non-evidence DPD impounded vehicle to Towing Company Plaintiffs' storage facilities.

258.   Defendant has further failed to pay Towing Company Plaintiffs pursuant to the express term of the City of Detroit Prompt Payment Ordinance.

259.   Defendant has further violated MCL 257.252g(2)(a) by withholding accrued towing and storage fees due to Towing Company Plaintiffs from proceeds of public sales of vehicles deemed abandoned.

260.   Defendant has further violated MCL 2557.252g(2)(a) by withholding storage charges rightfully earned for storage of vehicles on Sundays from proceeds of public sales of vehicles deemed abandoned.

261.   This matter presents a case of actual controversy, as Defendant has, and is expected to continue to:

    a.  Fail to pay Towing Company Plaintiffs pursuant to the terms of the contract and the Prompt Payment Ordinance;

    b.  Fail to limit the monthly police authorized tows allotted to the PTIU to 25% of all police tows;

    c.  Withhold accrued towing and storage fees due to Towing Company Plaintiffs from proceeds of public sales of vehicles deemed abandoned;

      d.  Withhold storage charges rightfully earned for storage of vehicles on Sundays from proceeds of public sales of vehicles deemed abandoned; and

      e.  Divert all non-evidence and non-forfeiture DPD impounded vehicles to PTIU storage lots.

      f.  "Handpick" which vehicles which PTIU will tow and store which may yield more revenue than other vehicles.

262.  Towing Company Plaintiffs have suffered and will continue to suffer irreparable harm unless an injunctive order is issued requiring Defendant and DPD to perform the tasks required of them by the contract, by the Prompt Payment Ordinance and by MCL 257.252g(2)(a), as thoroughly set forth in Counts I-XI.

263.  Without intervention from the Court, Towing Company Plaintiffs are apprehensive that Defendant and DPD will continue their actions in breach of the Contracts and in violation of the law as set forth above.

WHEREFORE, Towing Company Plaintiffs request that this Court enter an order requiring Defendant and DPD to:

      a.  Cease and desist operating a towing and storage facility in violation of MCL 123.1402, or in the alternative, limit the monthly police authorized tows allotted to the PTIU to 25% of all police tows;

      b.  Pay Towing Company Plaintiffs pursuant to the terms of the contract and the Prompt Payment Ordinance;

      c.  Cease and desist directing Towing Company Plaintiffs to tow any DPD impound vehicles that are not designated evidence or forfeiture to PTIU storage lots;

d. Pay all current and past accrued towing and storage fees due to Towing Company Plaintiffs from proceeds of public sales of vehicles deemed abandoned;

e. Pay all current and past storage charges rightfully earned for storage of vehicles on Sundays from proceeds of public sales of vehicles deemed abandoned;

Towing Company Plaintiffs further pray that this Court enter a Judgment in their favor and against Defendant for damages in an amount to be determined in excess of $75,000, plus interest, costs and attorney fees.

## COUNT XIII – PRELIMINARY INJUNCTION

264. Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 263 of their Complaint.

265. Based on the allegations pleaded in Counts I through X, Towing Company Plaintiffs have a likelihood of success on the merits of their claims.

266. Towing Company Plaintiffs will suffer irreparable harm and loss if Defendant is permitted to continue to:

a. Fail to pay Towing Company Plaintiffs pursuant to the terms of the contract and the Prompt Payment Ordinance;

b. Fail to limit the monthly police authorized tows allotted to the PTIU to 25% of all police tows;

c. Withhold accrued towing and storage fees due to Towing Company Plaintiffs from proceeds of public sales of vehicles deemed abandoned;

    d.  Withhold storage charges rightfully earned for storage of vehicles on Sundays from proceeds of public sales of vehicles deemed abandoned; and

    e.  Divert all non-evidence and non-forfeiture DPD impounded vehicles to PTIU storage lots.

267.    Towing Company Plaintiffs have no adequate remedy at law.

268.    Towing Company Plaintiffs will suffer greater injury from the denial of preliminary injunctive relief than Defendant will suffer from the granting of such relief.

269.    The granting of this preliminary injunction will further the public interest.

WHEREFORE, Towing Company Plaintiffs request that this Court enter a Preliminary Injunction ordering Defendant and DPD to:

    a.  Cease and desist operating a towing and storage facility in violation of MCL 123.1402, or in the alternative, Limit the monthly police authorized tows allotted to the PTIU to 25% of all police tows;

    b.  Pay Towing Company Plaintiffs pursuant to the terms of the contract and the Prompt Payment Ordinance;

    c.  Cease and desist directing Towing Company Plaintiffs to tow any DPD impound vehicles that are not designated evidence or forfeiture to PTIU storage lots;

    d.  Pay all current and past accrued towing and storage fees due to Towing Company Plaintiffs from proceeds of public sales of vehicles deemed abandoned; and

    e.  Pay all current and past storage charges rightfully earned for storage of vehicles on Sundays from proceeds of public sales of vehicles deemed abandoned.

Towing Company Plaintiffs further prays that this Court enter a Judgment in their favor and against Defendant for damages in an amount to be determined in excess of $75,000, plus interest, costs and attorney fees.

## COUNT XIV - RECISSION

270.   Towing Company Plaintiffs reallege and incorporate by reference Paragraphs 1 – 269 of their Complaint.

271.   In the event that this Court is unable to provide the injunctive relief requested in Counts XII and XIII, Towing Company Plaintiffs request that this Court declare the contract between Defendant and Towing Company Plaintiffs rescinded and void.

272.   While Towing Company Plaintiffs have abided by and adhered to all provisions and requirements of the contract between the parties, Defendant and DPD have failed and refused to abide and adhere to the provisions of the contract that Defendant drafted, without any input or opportunity to negotiate from Towing Company Plaintiffs.

273.   The provisions of the contract that Defendant and DPD have breached go to the heart of the agreement between the parties: timely payment for services provided and amount of services to be provided.

274.   If this Court is unable to enter an order requiring Defendant and DPD to adhere to the provisions of the contract, Towing Company Plaintiffs request this Court enter an order:

a.   Rescinding the contract between the parties;

b.   Making the Towing Company Plaintiffs whole for the breaches of the contract by Defendant and DPD; and

c.   Awarding Towing Company Plaintiffs compensation for payment for services lost to date; and

d.   Awarding Towing Company Plaintiffs compensation for revenue that will be lost for the rescission of the contract to the end date of the contract, July 31, 2027.

WHEREFORE, Towing Company Plaintiffs request this Honorable Court enter an Order rescinding the contract between the parties and granting a judgment in Towing Company Plaintiffs' favor and against Defendant City of Detroit in an amount to be determined in excess of $75,000, and award Plaintiff costs, interest and attorney fees and any other and further amount this Court deems just and reasonable.

CORCORAN AUSTIN, P.C.

Date:  December 13, 2023               By: */s/ JAMES R. AUSTIN*
                                            JAMES R. AUSTIN (P-43400)
                                            Attorney for Towing Company Plaintiffs
                                            6880 Thayer Lake Dr.
                                            Alden, MI 49612
                                            248-909-4752
                                            jaustin@jaustinlaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TROY'S TOWING, INC., a Michigan corporation,
H&B LAND, INC., a Michigan corporation, WAYNE'S
SERVICE, INC., a Michigan corporation, 7 D'S TOWING
AND STORAGE, INC., a Michigan corporation, ABA
IMPOUND, INC., a Michigan corporation, and
BOBBY'S TCB TOWING SERVICE, INC. a Michigan
corporation,

                                               Case No. 23-cv-

      Plaintiffs,                        Hon.

vs.

CITY OF DETROIT, a Michigan Municipal
Corporation,

      Defendant.
_____/

JAMES R. AUSTIN (P-43400)
MICHAEL J. CORCORAN (P41254)
Corcoran Austin, P.C.
Attorneys for Plaintiffs
6880 Thayer Lake Dr.
Alden, MI 49612
248-909-4752
jaustin@jaustinlaw.com
_____/

**DEMAND FOR JURY TRIAL**

     NOW COME Plaintiffs, TROY'S TOWING, INC., H&B LAND, INC.,

WAYNE'S SERVICE, INC., 7 D'S TOWING AND STORAGE, INC., ABA

IMPOUND, INC., and BOBBY'S TCB TOWING SERVICE, INC., by and through

their attorneys, Corcoran Austin, P.C., and pursuant to Fed.R.Civ.P. 38, hereby

demand a jury trial on all the issues so triable by a jury as pled in Plaintiffs' complaint.

CORCORAN AUSTIN, P.C.

Date: December 13, 2023                  By: */s/ JAMES R. AUSTIN*
                                              JAMES R. AUSTIN (P-43400)
                                              Attorney for Towing Company Plaintiffs